**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

THE HOLMES GROUP, INC.,        :
                 Plaintiff,    :
       v.                  :  Civil Action No. 05-CV-10504 (NMG)
                        :
EURO-PRO OPERATING, LLC,    :
                Defendant.   :

**MEMORANDUM IN OPPOSITION**
**TO HOLMES'S MOTION TO DISMISS**

This motion raises three questions for decision:

1.      To satisfy the particularity requirement of Rule 9(b), a party alleging inequitable conduct does not need to catalog every piece of evidence to be submitted at trial.  Rather, according to the First Circuit, the party must state the <u>time</u>, <u>place</u> and <u>content</u> of the false statements on which the inequitable-conduct claim is based.  In this case, Euro-Pro is aware of at least two false statements that Holmes made to the Patent and Trademark Office.  Both of them are in writing—and so Euro-Pro included in its pleading the exact date, place of filing and wording of both false statements.  Under these circumstances, has Euro-Pro satisfied the particularity requirement of Rule 9(b)?

2.      Under Federal law, leave to amend pleadings shall be liberally granted to protect the strong policy in favor of deciding Federal disputes based on merits, not technicalities, and the only exceptions to this rule are for litigants that have acted with undue delay, in bad faith, or where amendment would be futile.  In this case, Euro-Pro has acted promptly and in good faith in all aspects of this litigation and can include more detail of Holmes's inequitable if the Court deems it necessary.  Under these circumstances, should Euro-Pro be permitted an opportunity to amend its pleading if the Court deems it necessary?

3.    Under Federal law, the *Noerr-Pennington* doctrine does not apply when (1) there is no antitrust claim being asserted and (2) the communications in question do not involve a governmental petition protected under the First Amendment.  In this case, there is no antitrust claim being asserted, and the communications in question are intentionally false statements made by Holmes to one of Euro-Pro's most significant customers for the purpose of harming Euro-Pro's business.  Under these circumstances, does the *Noerr-Pennington* doctrine insulate Holmes against Euro-Pro's claims for tortious interference with business relations and unfair competition?

Euro-Pro respectfully suggests that the answers to the first two questions are yes and the answer to the third is no.

## STATEMENT OF FACTS[1]

This is a patent infringement case between two companies that manufacture and sell, among many other things, programmable slow cookers.  Basically, "programmable" slow cookers are slow cookers that use a digital circuit to control the time and temperature for the cooking process.[2]

Holmes filed this action against Euro-Pro on March 17, 2005.  Before filing this action, however, Holmes made certain statements to the Patent and Trademark Office and

---

[1] Of course the outcome of this motion depends upon the adequacy of Euro-Pro's pleading, and for purposes of this motion, the Court is required to assume that all facts in this pleading and all inferences that may be drawn therefrom are true.  Nevertheless, Euro-Pro has also prepared a more detailed description of the facts supported by the accompanying Declaration of Stanley Rosenzweig so that the Court can understand the history of the parties' dealings and the context of their current dispute.  Citations to both Euro-Pro's pleading and the Rosenzweig Declaration are shown below.

[2] Declaration of Stanley Rosenzweig ("Rosenzweig Decl."), ¶ 7; Declaration of Jeffrey L. Eichen ("Eichen Decl."), Exhibit A.

to at least one of Euro-Pro's customers. These statements form the basis for the counterclaims and affirmative defenses at issue in this motion. The events surrounding these statements are described in detail below.

In or about January 2003, Euro-Pro started selling a programmable slow cooker to its customer Home Shopping Network.[3] Soon afterwards, Holmes's CEO, Jerry Kahn, called Euro-Pro's president, Stanley Rosenzweig, to discuss this product. Mr. Kahn stated that he had seen Euro-Pro's programmable slow cooker on HSN and that Holmes might have a dispute with Euro-Pro over this product, since Holmes had or was in the process of obtaining a patent covering certain features of this product.[4] Mr. Kahn did not identify any specific patents or product features, and so the basis of Holmes's claim was not clear during this conversation. Mr. Rosenzweig responded that Euro-Pro's product was different from Holmes's product in a number of ways.[5] At that point, Mr. Kahn said that he would get back to Mr. Rosenzweig and the conversation ended.

Several months went by, and Euro-Pro did not hear anything further from Holmes about the programmable slow cooker.[6] Meanwhile, Euro-Pro started selling its programmable slow cooker through Sears. (The slow cookers sold through Sears carried the "Kenmore" brand name, rather than the "Euro-Pro" name.)

In early November 2003, Jerry Kahn of Holmes again spoke with Stanley Rosenzweig of Euro-Pro about Euro-Pro's programmable slow cookers.[7] Mr. Kahn said

---

[3] Rosenzweig Decl., ¶¶ 8.

[4] Id. at ¶¶ 8-9.

[5] Id. at ¶ 9.

[6] Id. at ¶ 10.

[7] Id. at ¶ 11.

that Euro-Pro and Holmes have a problem now that Euro-Pro is selling its programmable slow cooker to Sears. He said that Holmes did not want to sue Euro-Pro for patent infringement, but it may have to sue to protect its rights. In response, Mr. Rosenzweig told him that Euro-Pro was confident that its programmable slow cooker does not infringe upon Holmes's patent. Mr. Rosenzweig also said that, if Holmes decided to sue for patent infringement, Holmes's patent would probably end up being invalidated, because Euro-Pro had discovered some very significant prior art that obviously had not been raised with the Patent and Trademark Office.[8] Mr. Rosenzweig then specifically offered to provide this prior art to Mr. Kahn. In response, Mr. Kahn only said, "I'll get back to you," and the conversation ended.

Following this conversation in early November 2003, Euro-Pro did not hear anything from Holmes for several weeks.[9] But, during this same period, Holmes represented in writing to the Patent and Trademark Office that it "was not aware of any other references to be identified at this time." This representation appears in two written Information Disclosure Statements filed with the Patent and Trademark Office on November 13 and December 1, 2003.[10] Holmes knew that both of these statements were false at the time that Holmes made them—as Holmes was aware that other significant prior art existed and was available for the asking.[11] Indeed, it appears that Holmes purposefully refused Euro-Pro's offer to see the prior art that Euro-Pro had discovered— because once Holmes learned about it, Holmes would be under an obligation to disclose

---

[8] Id.; Answer at 9, ¶ 48.

[9] Rosenzweig Decl., at ¶ 12.

[10] Answer at 9-10, ¶ 49; Eichen Decl., Exhibits B & C.

[11] Answer at 10, ¶ 50; Rosenzweig Decl., ¶¶ 12-13.

it to the Patent and Trademark Office. All of these facts are described in detail in Euro-Pro's answer and counterclaims.

In early 2004, Jerry Kahn of Holmes again spoke to Stanley Rosenzweig about their programmable-slow-cookers dispute.[12] Mr. Kahn offered the following compromise—that Holmes would not enforce its patent against Euro-Pro if Euro-Pro "turned over" its Sears business to Holmes. Mr. Rosenzweig responded that the offer was unacceptable and that, if Holmes went forward with litigation against Euro-Pro, Holmes faced a very substantial risk of having its patent invalidated based on the prior art that Euro-Pro had uncovered. Mr. Kahn responded he did not want to go to court and would get back to Mr. Rosenzweig. Once again, their conversation ended at that point.

Later, in mid-2004, Euro-Pro learned that Holmes had been speaking directly with the Sears small kitchen appliance buyer about Holmes's claim of patent infringement against Euro-Pro.[13] Euro-Pro learned that someone from Holmes told Sears's buyer that Euro-Pro's programmable slow cookers infringed Holmes's patent, and that, very soon, Euro-Pro would be prohibited or unable to ship them. The Holmes employee then suggested that Sears change from Euro-Pro's product to Holmes's product so that Sears's supply would be uninterrupted. Holmes's employee did not describe any details about how Euro-Pro's product is supposedly infringing or even the likelihood that Holmes's patent was invalid because of prior art that was never brought to the attention of the Patent and Trademark Office. Instead, it appears that the purpose of the call was to harm Euro-Pro's relationship with an important customer. Indeed, the fact that more than

---

[12] Id. at ¶ 13.

[13] Id. at ¶ 14; Answer at 11-12, ¶¶ 56, 61.

twelve months elapsed since this conversation without Holmes taking any steps against either Euro-Pro or Sears to stop the shipment of Euro-Pro's products is proof enough of the falsity of Holmes's statements.

After Mr. Rosenzweig's last conversation with Mr. Kahn in early 2004, Euro-Pro heard nothing from Holmes about the programmable slow cooker until Holmes filed the instant action on March 17, 2005.[14]

## ARGUMENT

A.    *Euro-Pro's Pleading Contains the Exact Time, Location, and Content of Holmes's False Statements to the PTO; Although Holmes May Dispute the Merits of Euro-Pro's Claim, Euro-Pro's Claim Meets All of the Requirements for Pleading Inequitable Conduct.*

It is well established that patent applicants owe a duty of candor and good faith to the PTO, and that intentionally breaching this duty subjects the applicant to liability for inequitable conduct.[15]  An applicant may breach its duty of candor in a number of different ways—such as an affirmative misrepresentation of a material fact, a failure to disclose material information, or the submission of false material information.[16]

According to the Federal Circuit, there are only two requirements for proving inequitable conduct:  (1) the information that was misrepresented or withheld must be material to patentability, and (2) the person who misrepresented or withheld the

---

[14] Id. at 7, ¶ 34; Rosenzweig Decl., ¶ 15.

[15] Bruno Ind. Living Aids, Inc. v. Acorn Mobility Servs., Ltd., 394 F.3d 1348, 1351 (Fed. Cir. 2005); Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc., 326 F.3d 1226, 1233 (Fed. Cir. 2003);  Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed. Cir. 1995).

[16] Bristol-Myers Squibb, 326 F.3d at 1233;  Molins, 48 F.3d at 1178.

6

information must have intended to deceive or mislead the PTO.[17]  Therefore, to state a claim for inequitable conduct, a party must allege facts sufficient to meet both of the two requirements described above.  In other words, if a pleading alleges that the patent applicant was or should have been aware of information <u>material to patentability</u> and that he <u>intentionally</u> failed to disclose this information to the PTO <u>in order to deceive the examiner</u>, then the pleading states a proper claim for inequitable conduct.[18]

Moreover, there is no dispute that a claim for inequitable conduct must be stated with "particularity" under Rule 9(b) of the Federal Rules of Civil Procedure.[19]  But particularity does not mean that the pleading must contain an exhaustive description of every piece of evidence and testimony to be raised at trial.  The purpose of the particularity requirement is simply to give the opposing party sufficient notice of the inequitable conduct claim to prepare a meaningful response and to demonstrate to the Court that the allegation is not frivolous.[20]  According to the First Circuit (whose law

---

[17] <u>Bruno</u>, 394 F.3d at 1351; <u>Hoffmann-La Roche, Inc. v. Promega Corp.</u>, 323 F.3d 1354, 1359 (Fed. Cir. 2003); <u>PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.</u>, 225 F.3d 1315, 1318 (Fed. Cir. 2000); <u>Smith & Nephew, Inc. v. Surgical Solutions, Inc.</u>, 353 F. Supp. 2d 135, 140 (D. Mass. 2004).

[18] <u>Id</u>.

[19] <u>Ferguson Beauregard/Logic Controls v. Mega Sys., LLC</u>, 350 F.3d 1327, 1344 (Fed. Cir. 2003).

[20] <u>Davidson v. Cao</u>, 211 F. Supp. 2d 264, 287 (D. Mass. 2002)

applies in matters of procedure not unique to patent law),[21] Rule 9(b) requires that the pleading contain only "the time, place, and content of an alleged false representation."[22]

In this case, Euro-Pro has provided more than enough detail to meet the two elements required for alleging inequitable conduct (materiality and intent to deceive) and fulfill the particularity requirements of Rule 9(b)—namely, the exact time, place and content of Holmes's false representations to the PTO.

In fact, Euro-Pro is presently aware of at least two intentionally false statements by Holmes—both of which appear in written information disclosure statements (or IDSs) that Holmes submitted to the PTO during prosecution of the '855 and '921 patents.[23] Holmes filed these two IDSs on November 13 and December 1, 2003, both in the PTO's office in Alexandria, Virginia. Both IDSs contain the same false statement: "Applicants are not aware of any other references to be identified at this time."[24]

As set forth in Euro-Pro's pleading, Holmes knew that these statements were false and material at the time of filing and intended that the PTO would be deceived by them. In fact, Holmes was aware that other material prior art was readily available, as Euro-Pro had already offered to provide this prior art to Holmes, and Holmes had simply refused Euro-Pro's offer, apparently based on some misguided belief that maintaining a willful

---

[21] Panduit Corp. v. All States Plastic Mfg. Inc., 744 F.2d 1564, 1574-75 (Fed. Cir. 1984); Systemation, Inc. v. Engel Indus., Inc., 183 F.R.D. 49, 51 n.1 (D. Mass. 1998).

[22] Davidson, 211 F. Supp. 2d at 286 (citation omitted); Johnson v. Brown & Williamson Tobacco Corp., 122 F. Supp. 2d 194, 207 (D. Mass. 2000) (citing Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996)); Systemation, 183 F.R.D. at 51.

[23] See Eichen Decl., Exhibits B & C; see also Answer at 9-10, ¶ 49.

[24] Eichen Decl., Exhibits B & C.

ignorance of prior art would somehow excuse it from its duty of candor and good faith towards the PTO.[25]

While Holmes may disagree with Euro-Pro's evidence, the exact <u>dates</u> (November 13 and December 1, 2003), <u>locations</u> (Alexandria, Virginia) and <u>content</u> ("Applicants are not aware of any other references to be identified at this time.") of Holmes's false statements are perfectly evident from Euro-Pro's pleading.[26]  Euro-Pro has also stated that the information deliberately ignored by Holmes was material to the patentability of the two claimed inventions and that Holmes intentionally omitted any reference to this information from its statements to the PTO in order to deceive the PTO into believing that this information did not exist.[27]  Accordingly, Euro-Pro's pleading satisfies both the particularity requirement of Rule 9(b), as described by courts in this Circuit in the cases cited above, and the Federal Circuit's two legal requirements for stating a claim for inequitable conduct (materiality and intent to deceive).

In fact, upon closer inspection, Holmes's motion to dismiss is not really based on any lack of particularity regarding Holmes's false statements.  Indeed, Holmes's false statements to the PTO are in writing and described in detail in Euro-Pro's pleading[28]— and so Holmes can hardly argue that they have not been alleged with particularity. Instead, Holmes's motion is based on the argument that Euro-Pro's pleading must also describe the specific prior art that Euro-Pro offered to Holmes in November 2003, which Holmes refused to accept and then failed to disclose to the PTO.

---

[25] <u>Id</u>., ¶¶ 47-50; Rosenzweig Decl., ¶ 15.

[26] <u>See</u> Answer at 9-10, ¶¶ 47-50.

[27] <u>Id</u>.

[28] <u>Id</u>.

The identity of this prior art is certainly relevant to Euro-Pro's claim and a proper object for discovery. But there is no legal authority anywhere that requires Euro-Pro to include in its allegations the details of this prior art or other documents that were in Euro-Pro's files at the time that Holmes made its false statements to the PTO. Like other pieces of evidence that support Euro-Pro's claim, the various pieces of prior art known to Euro-Pro and Holmes will be presented at trial and the outcome of Euro-Pro's claim will depend on the jury's evaluation of it. Holmes, on the other hand, will have an opportunity to conduct whatever discovery it deems necessary to prepare for trial— including, probably, interrogatories about the prior art and depositions of Euro-Pro's witnesses.

But just because certain facts are open to discovery or will be used at trial does not mean that they must be included in Euro-Pro's pleading. In fact, to show that a particular statement is fraudulent, there are always other facts that need to be provided to the jury—such as what the person knew at the time of making the fraudulent statement, in what way the fraudulent statement was false when made, and the intentions of the person making the fraudulent statement. Rule 9(b), however, does not require a pleading to contain every piece of evidence needed to prove the fraud. Instead, Rule 9(b) simply requires the pleading to show the "time, place, and content of an alleged false representation."[29] And that is precisely what Euro-Pro has provided here.

Likewise, Holmes seems to argue in its motion papers that it cannot be held liable for inequitable conduct if it was willfully ignorant of prior art that otherwise should have

---

[29] <u>Doyle</u>, 103 F.3d at 194; <u>Davidson</u>, 211 F. Supp. 2d at 268; <u>Johnson</u>, 122 F. Supp. 2d at 207; <u>Systemation</u>; 183 F.R.D. at 51.

been disclosed to the PTO.  But this argument is also incorrect.  As the Federal Circuit

had held, "one should not be able to cultivate ignorance, or disregard numerous warnings

that material information or prior art may exist, merely to avoid actual knowledge of that

information or prior art."[30]  When a patent applicant affirmatively "cultivates ignorance"

of material prior art in an effort to defeat the duty of candor and good faith, as Holmes

has done in this case, the consequences are perfectly clear—the applicant is liable for

inequitable conduct.

In conclusion, Euro-Pro has provided an exact description of the time, location

and content of the false statements made by Holmes that are the basis of Euro-Pro's claim

of inequitable conduct, as required by Rule 9(b) of the Federal Rules of Civil Procedure

and the applicable First Circuit case law.[31]  Euro-Pro's pleading also contains both of the

elements required to state a claim for inequitable conduct under the applicable Federal

Circuit case law.[32]  While Holmes may disagree with the merits of Euro-Pro's claim,

there is no doubt that Euro-Pro has provided more than enough information to enable

Holmes to prepare a response to the claim and to ensure that Euro-Pro's claim is not

frivolous.  For these reasons and those described above, Holmes's motion to dismiss

Euro-Pro's third counterclaim and second affirmative defense should be denied.

---

[30] FMC Corp. v. Hennessy Indus., Inc., 836 F.2d 521, 526 (Fed. Cir. 1987); see also Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp., 267 F.3d 1370, 1383 (Fed. Cir. 2001).

[31] Answer at 9-10, ¶¶ 47-50.

[32] Id. (discussing materiality of withheld information, intent to deceive).

**B.    *If Euro-Pro's Pleading Were Missing Details Necessary to State a Claim for Inequitable Conduct, Euro-Pro Should Be Given Leave to Amend.***

Leave to amend under Rule 15 "is freely given when justice so requires" absent an adequate basis to deny amendment, such as futility, bad faith, undue delay or a dilatory motive.[33] The rule favoring liberal amendments is based upon the modern approach toward pleadings—which encourages resolution of disputes based on merits, not technicalities.[34] Rule 15(a) refers to "pleadings" and thus applies to answers and counterclaims, as well as complaints.[35]

The party attempting to show futility has a high burden to meet. The futility of a proposed amendment "is gauged by reference to the liberal criteria of Federal Rule of Civil Procedure 12(b)(6)."[36] In such circumstances, "amendment is not deemed futile as long as the proposed amended complaint sets forth a general scenario which, if proven, would entitle the plaintiff to relief against the defendant on some cognizable theory."[37]

In this case, Euro-Pro has included in its pleading all of the facts necessary to state a claim for inequitable conduct against Holmes. But, if the Court were to find that

---

[33] Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330-31 (1971); Maine State Building and Construction Trades Council, AFLCIO v. United States Department of Labor, 359 F.3d 14, 19 (1st Cir. 2004); Glassman v. Computervision Corp., 90 F.3d 617, 622 (1st Cir. 1996); One Beacon Ins. Co. v. Electrolux, 223 F.R.D. 21, 24 (D. Mass. 2004); McMillan v. Massachusetts Soc. for Prevention of Cruelty to Animals, 168 F.R.D. 94, 97 (D. Mass. 1995).

[34] Foman v. Davis, 371 U.S. 178, 182 (1962); Conley v. Gibson, 355 U.S. 41, 48 (1957).

[35] McMillan, 168 F.R.D. at 97.

[36] Hatch v. Department for Children, Youth and Their Families, 274 F.3d 12, 19 (1st Cir. 2001).

[37] Hatch, 274 F.3d at 19.

any required elements were missing, then Euro-Pro must be afforded an opportunity to fix this deficiency through amendment. To put it simply, there has been no delay, bad faith or dilatory motive of any kind by Euro-Pro. In fact, Euro-Pro has acted promptly and in good faith throughout this litigation—including Euro-Pro's filing of a more detailed pleading following a meet-and-confer over the subject matter of this motion.

As for the futility of any amendment, the attached declarations show that there is certainly more evidence, testimony and documents to support Euro-Pro's claim of inequitable conduct than what is included in Euro-Pro's current pleading. Rule 9(b) does not require Euro-Pro to describe all of this evidence in its pleading. But if the Court deems it necessary, Euro-Pro can certainly include more details of Holmes's inequitable conduct. The amendment, therefore, would not be futile.

Under these circumstances, Euro-Pro should be granted permission to amend its pleading if the Court deems it necessary.


C.    *Holmes's Prelitigation Statements to Euro-Pro's Customer are Not Excused by the* **Noerr-Pennington** *Doctrine*

A party cannot be held liable under antitrust law for exercising its right to petition the government—because the right to petition is guaranteed under the First Amendment of the Constitution.[38] This rule, called the *Noerr-Pennington* doctrine, is so named because of the two Supreme Court decisions in which the Court first decided that allowing an antitrust claim against a defendant who is merely petitioning the government would be inconsistent with the goals of the Sherman Act and inhibit parties from

---

[38] Tomaiolo v. Mallinoff, 281 F.3d 1, 11 (1st Cir. 2002); Tarpley v. Keistler, 188 F.3d 788, 793-95 (7th Cir. 1999).

exercising their First Amendment right to petition.[39]  Under this doctrine, all sorts of

conduct that might otherwise be actionable under antitrust laws—such as lobbying for the

passage of a law or suing a company for violating the law—is protected from liability.[40]

In the years since the Supreme Court first announced the *Noerr-Pennington*

doctrine, other courts have extended this doctrine to some non-antitrust claims.[41]  This

extension of the law makes sense too, because if a party can be held liable for unfair

competition or malicious prosecution or under some other theory merely for exercising its

right to petition, then the right to petition the government guaranteed by the First

Amendment is not freely available.[42]  For example, one who contacts a township official

for a clarification of state law cannot be held liable under 28 U.S.C. § 1983.[43]

But, while the *Noerr-Pennington* doctrine has been extended to encompass claims

other than antitrust, the scope of the doctrine is <u>narrower</u> when it is raised in response to

these non-antitrust claims.[44]  The reason the doctrine gets narrower is that, as originally

described by the Supreme Court, the doctrine was based upon <u>both</u> the Sherman Act <u>and</u>

the petition clause of the First Amendment.  When there is no Sherman Act claim, then

---

[39] <u>United Mine Workers of Am. v. Pennington</u>, 381 U.S. 657 (1965); <u>Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.</u>, 365 U.S. 127 (1961).

[40] <u>Davric Maine Corp. v. Rancourt</u>, 216 F.3d 143, 147-48 (1st Cir. 2000) (no antitrust liability for petitioning the Maine Harness Racing Commission).

[41] <u>See, e.g.</u>, <u>IGEN Int'l, Inc. v. Roche Diagnostics GmbH</u>**,** 335 F.3d 303, 310-12 (4th Cir. 2003); <u>Cheminor Drugs, Ltd. v. Ethyl Corp.</u>, 168 F.3d 119, 128-29 (3d Cir. 1999).

[42] <u>Munoz Vargas v. Romero Barcelo</u>, 532 F.2d 765, 766 (1st Cir. 1976) ("[T]here is no remedy … against private persons who urge the enactment of laws, regardless of their motives.").

[43] <u>Tomaiolo</u>, 281 F.3d at 10-11.

[44] <u>Cardtoons, L.C. v. Major League Baseball Players Ass'n</u>, 208 F.3d 885, 888-91 (10th Cir. 2000).

the scope of the doctrine depends solely on the somewhat narrower limits of the First Amendment.[45]  Therefore, if one invokes the *Noerr-Pennington* doctrine in response to a claim other than antitrust, the question becomes this—does the petition clause of the First Amendment immunize the conduct in question?  If not, then *Noerr-Pennington* doctrine does not apply, because both of the reasons for invoking the doctrine (Sherman Act and First Amendment) are absent.

None of the First Circuit's *Noerr-Pennington* cases discuss the scope of the doctrine when applied to non-antitrust claims[46]—and so they are of limited relevance in this case, where there is no antitrust claim being asserted.

Of the cases that have applied the *Noerr-Pennington* doctrine in situations outside the antitrust context, the most definitive is the Tenth Circuit's *en banc* decision in *Cardtoons*.  In that decision, the Tenth Circuit held that the *Noerr-Pennington* doctrine, when raised in response to claims other than antitrust, does NOT immunize prelitigation threats communicated solely between private parties—because such prelitigation threats are not protected under the petition clause of the First Amendment.[47]  Or, as the Tenth Circuit stated, "statements made in a letter threatening litigation are not absolutely protected by the petition clause of the First Amendment and are subject to the principles

---

[45] Id.; cf. Coastal States Mktg., Inc. v. Hunt, 694 F.2d 1358, 1364-65 (5th Cir. 1983) ("*Noerr* was based on a construction of the Sherman Act.  It was not a first amendment decision.").

[46] See, e.g., Davric, 216 F.3d 143 (antitrust claims); Clamp-All Corp. v. Cast Iron Soil Pipe Inst., 851 F.2d 478 (1st Cir. 1988) (same); Manego v. Orleans Bd. of Trade, 773 F.2d 1 (1st Cir. 1985) (same); Massachusetts Furniture & Piano Movers Ass'n v. FTC, 773 F.2d 391 (1st Cir. 1985); Corey v. Look, 641 F.2d 32 (1st Cir. 1981) (same); Whitten v. Paddock Pool Builders, Inc., 424 F.2d 25 (1st Cir. 1970) (same)

[47] Cardtoons, 208 F.3d at 891.

of state common law and state statutory law."[48]   A number of other courts have followed

the Tenth Circuit's reasoning in *Cardtoons*.[49]

There is also a well-recognized exception to the *Noerr-Pennington* doctrine for

"sham" petitions—that is, petitioning for governmental involvement when the petition is

"objectively baseless" and intended only to burden a rival with the governmental

decision-making process.[50]   Under the "sham" exception, otherwise protected conduct

loses its protection if it is objectively baseless in the sense that no reasonable litigant

could realistically expect success on the merits, or based not on a genuine interest in

redressing grievances but instead for harassment.[51]

In this case, the conduct alleged by Euro-Pro consists of prelitigation

communications between private parties, does not involve an antitrust claim, and thus is

outside the scope of the petition clause of the First Amendment and the *Noerr-

Pennington* doctrine.

Specifically, Euro-Pro's third affirmative defense and fourth and fifth

counterclaims are based upon Holmes's knowingly false statements to Euro-Pro's

customers, such as Sears, that Euro-Pro's product infringed Holmes's patents and that

---

[48] Id. at 891-92.

[49] See, e.g., Audi AG v. D'Amato, 341 F. Supp. 2d 734, 758 (E.D. Mich. 2004)
(citing cases); DIRECTV, Inc. v. Cavanaugh, 321 F. Supp. 2d 825, 840-41 (E.D. Mich.
2003); Porsche Cars N. Am., Inc. v. Lloyd Design Corp., 2002 U.S. Dist. LEXIS 9612
*129-30 (N.D. Ga. 2002).

[50] Davric, 216 F.3d at 147-48; IGEN, 335 F.3d at 312; see also Professional Real
Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 60-61 (1993); City
of Columbia v. Omni Outdoor Adver., Inc., 499 U.S. 365, 380 (1991).

[51] Carroll Touch, Inc. v. Electro Mech. Sys., Inc., 15 F.3d 1573, 1581-83 (Fed.
Cir. 1993); Honeywell Consumer Prods., Inc. v. Windmere Corp., 993 F. Supp. 22, 24
(1998).

Euro-Pro's products would soon be unavailable because of this infringement.[52]  At the time that Holmes made these statements, Holmes certainly knew that they were false.  In fact, Holmes had been offered prior art that would have invalidated at least one of its patents, but Holmes did not disclose this fact to anyone, not even the Patent and Trademark Office.[53]  Holmes knew that there was no valid claim against Euro-Pro's products and that Euro-Pro was not prohibited or unable to ship them.  Instead, these intentionally false statements were intended and designed to harm Euro-Pro's relationship and existing business with its customers.

There is no governmental petition buried in any of these false communications— and thus no immunity from liability under the First Amendment or *Noerr-Pennington* doctrines.  In fact, Holmes does not cite even one case, much less a First Circuit case, in which the *Noerr-Pennington* doctrine is applied in a situation such as this one, where there is no antitrust claim and no governmental petition at stake.  Instead, the *Cardtoons* rule applies, and there is no immunity available to insulate Holmes from liability for its tortious conduct.

Moreover, even if this Court were to find that the *Noerr-Pennington* doctrine does apply, the facts alleged by Euro-Pro fall well within the "sham" exception.  Specifically, Holmes's statements to Euro-Pro's customers were intentionally and knowingly false— and intended not as a legitimate governmental petition but solely to harass Euro-Pro and harm its relations with customers.  As this Court found in *Honeywell*, intentional, tortious conduct such as that falls squarely within the sham exception of *Noerr-Pennington*.

---

[52] Rosenzweig Decl., ¶ 14; Answer at 11-12, ¶¶ 56, 61.

[53] Rosenzweig Decl., at ¶¶ 11-13; Answer at 9-10, ¶¶ 47-50.

To summarize, there can be no dispute that Holmes's motion to dismiss on the basis of *Noerr-Pennington* must fail.  There is no legal authority whatsoever that the *Noerr-Pennington* doctrine applies in cases such as this one—because there is <u>no antitrust claim</u> and <u>no governmental petition</u> to be protected.  Even if there were some basis for invoking the *Noerr-Pennington* doctrine here, all of Holmes's conduct falls within the scope of the sham exception.  For these reasons and those described above, Holmes's motion to dismiss Euro-Pro's third affirmative defense and fourth and fifth counterclaims must be dismissed.

<u>**CONCLUSION**</u>

For the reasons set forth above, Euro-Pro respectfully requests that this Court deny Holmes's motion to dismiss and/or strike.

Date:  July 18, 2005                    EURO-PRO OPERATING, LLC,
                                        By its attorneys,


                                        ___/s/ Michelle Chassereau Jackson_____
                                        Daniel J. Gleason (BBO #194900)
                                        Ronald E. Cahill (BBO# 638200)
                                        Michelle Chassereau Jackson (BBO #654825)
                                        NUTTER MCCLENNEN & FISH LLP
                                        World Trade Center West
                                        155 Seaport Boulevard
                                        Boston, MA 02210-2604
                                        (617) 439-2000

                                        Of Counsel:

                                        Roger A. Colaizzi (pro hac vice)
                                        Jeffrey L. Eichen (pro hac vice)
                                        Michelle M. Marcus (pro hac vice)
                                        VENABLE LLP
                                        575 7th Street, NW
                                        Washington, D.C.  20004
                                        Tel:  (202) 344-4000

18

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

THE HOLMES GROUP, INC.,        :
                Plaintiff,   :
     v.               : Civil Action No. 05-CV-10504 (NMG)
                        :
EURO-PRO OPERATING, LLC,   :
              Defendant. :

## ORDER

Upon consideration of the positions of the parties, IT IS this \_\_\_\_ day of July, 2005, ORDERED that Plaintiff Holmes Group, Inc.'s Motion to Strike and/or Dismiss Euro-Pro's Third, Fourth, and Fifth Counterclaims and Second and Third Affirmative Defenses is hereby DENIED.

_____

The Hon. Nathaniel M. Gorton
United States District Court Judge