IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

THE HOLMES GROUP, INC.,
         Plaintiff,

v.                               Civil Action No. 05-CV-10504 (NMG)

EURO-PRO OPERATING, LLC,
         Defendant.

## DECLARATION OF STANLEY ROSENZWEIG

I, STANLEY ROSENZWEIG, do hereby declare and testify as follows:

1. I am the president of Euro-Pro Operating, LLC, the defendant in this litigation, where I have worked since January 2002. As such, I have personal knowledge of the facts set forth below (except where I have noted otherwise) and, if asked, can testify competently to each of them.

2. Before I began working at Euro-Pro, I was chief operating officer of The Holmes Group, Inc., the plaintiff in this litigation. I worked as Holmes's COO for ten years, from July 1991 to January 2002. Holmes is in the business of selling home appliances such as air purifiers, fans, heaters, humidifiers, and lighting products. During my tenure as COO, Holmes grew from approximately $40 million to more than $700 million in annual sales, and I became one of Holmes's largest shareholders and a member of the board of directors. While at Holmes, I worked very closely with the company's CEO Jerry Kahn.

3. Euro-Pro is in the business of importing and selling a large variety of kitchen and home appliances, including vacuum cleaners, sweepers, steam cleaners, toaster ovens, blenders, fryers and the like. I have always had a close relationship with Euro-Pro, since the company was actually founded by my family in the 1950s. Since its

founding, my parents and (in later years) my siblings have worked in Euro-Pro's business, even while I worked for years at a competitor.

4. After serving ten years as COO of Holmes, I decided to leave for employment with Euro-Pro, my family's business. My departure from Holmes was amicable, and I remained at Holmes for six months after I gave notice, at the request of Holmes. I discussed my decision with Jerry Kahn, and he was always supportive of the move.

5. Of course, even after leaving Holmes for my current position, I was still a large shareholder and, for a short period of time after my departure, a member of Holmes's board of directors. Eventually, it was clear to me that continuing to serve on Holmes's board could potentially pose a conflict, and therefore I resigned.

6. Although I had left Holmes to work for a competitor and resigned my seat from the board of directors, I still remained close friends with Jerry Kahn throughout this entire period, along with many other employees from Holmes. Of course we did not speak as often as we had while I was working at Holmes, but I would still speak with Mr. Kahn at least every week, either by telephone or in person.

7. In or about January 2003, Euro-Pro began offering for sale a type of slow cooker in which the time and temperature are controlled by a digital circuit board. This type of slow cooker is generally referred to as a programmable slow cooker.

8. Initially, Euro-Pro started selling its programmable slow cooker to Home Shopping Network. Soon afterwards, Jerry Kahn mentioned in one of our conversations that he was aware that Euro-Pro was offering a programmable slow cooker for sale on

2

HSN. At this time, I do not recall the exact date of this conversation, but it was sometime in the late spring or early summer of 2003.

9. During this conversation, Jerry said that Holmes might have a dispute with Euro-Pro over the programmable slow cooker, since Holmes had or was in the process of obtaining a patent covering certain features of this product. Jerry did not identify any specific patents or product features, and so it was not clear what sort of claim Holmes might be making against Euro-Pro's product. I did tell Jerry that Euro-Pro's product was different from Holmes's product in a number of ways. At that point, the conversation ended with Jerry's saying that he would get back to me shortly.

10. Several months went by, and I did not hear anything further from Jerry Kahn about the programmable slow cooker. Meanwhile, Euro-Pro started selling its programmable slow cooker to Sears as well. (The slow cookers sold to Sears carried the "Kenmore" brand name, rather than the "Euro-Pro" name).

11. In early November 2003, Jerry Kahn brought up Euro-Pro's programmable slow cookers in one of our conversations. I do not recall the exact date of this conversation, but I believe it occurred sometime during the first two weeks of November. Jerry told me that Euro-Pro and Holmes have a problem now that Euro-Pro was selling its programmable slow cooker to Sears. Jerry said that Holmes did not want to sue Euro-Pro for patent infringement, but that it may have to sue to protect its rights. In response, I told him that Euro-Pro was confident that our programmable slow cooker did not infringe upon Holmes's patent. I advised him that I did not want to do anything to harm Holmes's business, but if Holmes decided to sue for patent infringement, Holmes's patent would probably end up being invalidated, because Euro-Pro had

discovered some very significant prior art that obviously had not been raised with the Patent and Trademark Office. I then specifically offered to provide this prior art to Jerry. In response, Jerry only said, "I'll get back to you." At that point, our conversation ended.

12. Several weeks went by, and I did not hear anything further from Jerry about the programmable slow cookers. Recently, however, I learned that, after my conversation with Jerry, Holmes stated in writing to the Patent and Trademark Office that it "was not aware of any other references to be identified at this time." I believe that this statement was false, since Holmes knew that Euro-Pro had discovered significant prior art and that it was available to Holmes for the asking.

13. In early 2004, Jerry again brought up the programmable slow cooker in a conversation. He said that he had thought about our previous conversation and that he had a possible compromise—that Holmes would not enforce its patent against Euro-Pro if Euro-Pro "turned over" its Sears business to Holmes. I told him that his offer was unacceptable. And I also reminded him that, if he went forward with litigation against Euro-Pro, Holmes faced a very substantial risk of having its patent invalidated based on prior art that Euro-Pro had uncovered. Jerry Kahn said that he did not want to go to court and that he would get back to me. At that point, our conversation ended.

14. Later, in mid-2004, I learned that Holmes had been speaking directly with the Sears small kitchen appliance buyer regarding a Holmes's claim of patent infringement against Euro-Pro. Apparently, someone from Holmes told the Sears buyer that Euro-Pro's programmable slow cookers infringed Holmes's patent and that, very soon, Euro-Pro would somehow be prohibited or unable to ship them. The Holmes employee then suggested that Sears change from Euro-Pro's product to Holmes's product

so that Sears's supply did not get interrupted. From what I understand, the Holmes employee did not describe any details about how Euro-Pro's product is supposedly infringing or even the likelihood that Holmes's patent was invalid because of prior art that was never brought to the attention of the Patent and Trademark Office. Instead, it appears that the purpose of the meeting was simply to harm Euro-Pro's relationship with an important customer.

15. After my conversation with Jerry Kahn in early 2004, I did not hear anything further from him about the programmable slow cooker until Holmes filed this action against Euro-Pro on March 17, 2005.

16. I hereby I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 17, 2005

_____
STANLEY ROSENZWEIG